**TWIN CITY FIRE INSURANCE COMPANY, Appellant,**

v.

**Loy GRIMES, Appellee.**

**No. 12–86–0032–CV.**

Court of Appeals of Texas, Tyler.

Feb. 27, 1987.

Rehearing Denied March 20, 1987.

Wm. Drew Perkins, Lufkin, for appellant.

Curtis W. Leister, Beaumont, for appellee.

COLLEY, Justice.

In this workers' compensation case, plaintiff/appellee Loy Grimes, a sixty-one-year-old worker, recovered a judgment for lump sum payment of benefits under the Workers' Compensation Act[1] for total and permanent incapacity resulting from an occupational disease[2] contracted during the course of his employment with Nibco, Inc. Defendant/appellant Twin City Fire Insurance Company (Twin City), the compensation carrier, argues three points of error, challenging the legal and factual sufficiency of the evidence to support the jury's findings of total and permanent incapacity. We affirm.

The evidentiary points raised by Twin City are couched in the following language:

POINT OF ERROR NUMBER ONE:

The Honorable Trial Court erred in entering Judgment for the Plaintiff because there is no evidence the neuropathy of Loy Grimes prevented his performing the ordinary tasks of a working man.

POINT OF ERROR NUMBER TWO:

There is insufficient evidence to support the jury's finding that the peripheral neuropathy of Loy Grimes prevented his performing the ordinary tasks of a working man.

POINT OF ERROR NUMBER THREE:

The jury's finding he was unable to perform the ordinary tasks of a working man as a result of the peripheral neuropathy is so against the great weight of the preponderance of the evidence as to be manifestly unjust and wrong.

A somewhat thorough discussion of the evidence is necessary to a resolution of Twin City's points of error.[3] Grimes began working at Nibco[4] in 1957 when he was thirty-three years of age. He worked regularly and continuously until March, 1983, at which time he resigned his position. Grimes related that in 1983 he was having problems with numbness in his legs and hands, leg cramps, dizziness, mental confusion and loss of memory. He saw Dr. Thomas Pennington, his family physician, who tentatively diagnosed Grimes to be suffering from neuropathy of the left leg. Dr. Pennington referred Grimes to a Nacogdoches neurologist, Dr. A.M. Khatri. Dr. Khatri administered certain tests of Grimes' urine designed to detect the presence of "heavy metals" in Grimes' blood. The tests revealed the only metal present in Grimes' blood in above normal levels was zinc, which did not adversely affect nerve tissue; however, Khatri, after extensive testing, confirmed Dr. Pennington's impression that Grimes was suffering from peripheral neuropathy, a disease of the nerves of the body that can be produced by several causes. Medical testimony generally defined the disease as a "slowing of the nerves" which usually brings on numbness and weakness in the affected areas and parts of the body, as in the case of Grimes his legs, feet and hands. Khatri stated that zinc was not toxic to nerve tissue, and thus was not the cause. The tests administered by Khatri demonstrated that high levels of lead were not present in Grimes' blood, but since other testing[5] done by Khatri positively demonstrated that Grimes was indeed suffering from neuropathy, and because he was unable because of lack of testing equipment and materials to determine the cause of the neuropathy, Khatri referred Grimes to a neuromuscular specialist in Houston, Dr. Shuresh Roongta.

---

1.  Tex.Rev.Civ.Stat.Ann. art. 8306–8309a (Vernon 1967, Vernon Supp.1987). Hereinafter referred to as the Act, or the Workers' Compensation Act.

2.  Peripheral neuropathy. *See* art. 8306, § 20 (Vernon Supp.1987).

3.  We construe the points as challenging the legal and factual sufficiency of the evidence to

support the jury's findings of total and permanent incapacity (Special Issues 3 and 5).

4.  A foundry, casting valves and filters from alloys of copper, lead, tin and zinc.

5.  Nerve conduction and sensitivity tests.

Khatri, during his examination of Grimes before the referral to Roongta, made several medical findings, to wit, that as a result of the neuropathy, Grimes had difficulty in walking, some loss of balance, numbness, and some fine motor problems with his hands. He also found that Grimes' legs were not in "good shape." Khatri related that since these conditions had not improved within two years, he thought that it was more or less a permanent condition.

Dr. Roongta testified by deposition to the tests administered to Grimes. He submitted several reports of the results of the testing by his deposition. He testified that he injected a chemical substance, referred to as EDTA, into Grimes' bloodstream, and following that, confined Grimes in the hospital for at least twenty-four hours. During that twenty-four-hour period, Grimes' urine was tested periodically for the presence of lead. Test results showed the presence of 320 micrograms of lead per liter of urine, which Dr. Roongta said demonstrated that Grimes' blood contained four times the normal and medically acceptable levels of lead in the blood of humans. Khatri, who reviewed the test results obtained by Roongta, explained why Roongta's tests showed presence of lead in Grimes' blood in abnormally high levels when the test he had administered did not. Khatri explained that when EDTA is injected, it dislodges any lead previously deposited in body tissue and bone marrow, releasing the lead into the bloodstream where it is eventually excreted in the person's urine. Khatri also testified that a nerve biopsy performed by Roongta and reviewed by him eliminated all natural causes of the neuropathy so that it is "highly probable" that lead poisoning caused Grimes' neuropathy. Dr. Khatri declined to state whether Grimes' ailment was caused by exposure to lead on the job. However, Dr. Gary K. Friedman, an occupational medicine specialist whose testimony is undisputed, stated that after his review of Grimes' medical and job histories and his medical records, including Dr. Roongta's test results, that the neuropathy was caused by lead poisoning. Dr. Friedman testified that it was a classical case of occupational lead exposure.

Grimes testified that beginning about 1983 and shortly before he resigned, he had chronic leg cramps, spells of dizziness and had difficulty in keeping his balance; that he could not grip a tool with his hands; and that he was unable to perform any manual labor. His wife also testified, largely corroborating Grimes' testimony.

At the close of Grimes' case, Twin City called Dr. Pennington to the stand. He related at length the various ailments, injuries, and diseases for which he had treated Grimes for a period of time from 1955 to 1983, most of which were totally unrelated to the neuropathy. However, Dr. Pennington reported in 1973 that Grimes visited his office complaining of numbness in his left leg; that again in 1977 and 1978 he saw Grimes on complaints of dizziness and difficulty with balance. In 1983, Dr. Pennington made his first diagnosis that Grimes was suffering from "left lower leg neuropathy" and then referred him promptly to Dr. Khatri. On cross-examination Dr. Pennington testified that he had in December 1983 written a medical report that Grimes was totally disabled. Other than that report, no medical witness expressly testified that Grimes was either totally or permanently incapacitated by the onset of the occupational disease.

Twin City's argument under its points of error asserts that the issue here involved presents "a fundamental philosophical question about the purpose of workers' compensation." In synopsis, Twin City contends that whether a worker is incapacitated under the Act must be answered by giving due consideration to the fact that a worker's task at most plants and work places is accomplished with a minimal degree of human physical strength because of the present state of industrial technology, meaning automation and labor performed by human controlled equipment or machinery. Hence, the argument goes, since Grimes' job at Nibco's foundry at the time of his resignation was a task which could be accomplished by standing or sitting on a stool and pushing buttons or twisting dials, and since there is testimony that he could physically perform these

tasks, Grimes, though afflicted with the neuropathy, was not incapacitated to any degree. Twin City in support of this thesis cites us to portions of the testimony of Drs. A.M. Khatri, Thomas Pennington and Shuresh Roongta, and Don Hamilton, Nibco's plant superintendent. Dr. Khatri stated that Grimes was capable of performing "some type of job with minimal activity of the hands." Dr. Pennington testified that Grimes was able to operate "a panel ... of buttons and dials." Dr. Roongta testified that the neuropathy was not "significantly disabling ... except doing fine things with his hands." He further testified on cross-examination that Grimes was able to bend, stoop, walk and lift. Mr. Hamilton stated[6] that if Grimes had not resigned he would "still have a job [at Nibco]."

■ The principal thrust of Twin City's appellate effort here is an assault against the standard definition of "total incapacity" formulated by the Texas Supreme Court.[7] Such entreaty is obviously a predicate here for address to the Supreme Court by application for writ of error. This court is bound[8] to follow the standard definition of "total incapacity" clearly enunciated by the *Mallard* court.

In addition to the testimony cited by Twin City in its argument, there is medical testimony[9] in this case that if a person exposed to lead poisoning in his work place is removed from that environment, the neuropathy may or may not diminish, that is, the nerves affected may or may not recover from the toxic injury. Also, Dr. Khatri testified that the neuropathy suffered by Grimes ranged from mild to moderate.

■ On the evidence discussed above, the trial court submitted the issues raised by the evidence and defined "total incapacity" for the jury as follows:

'TOTAL INCAPACITY' does not imply absolute inability to perform any kind of labor, but means that one is disabled from performing the usual tasks of a workman, not merely the usual tasks of any particular trade or occupation, to such an extent that he cannot get and keep employment.

Twin City did not object to that definition and indeed the definition is substantially correct. *Texas Employers Insurance Association v. Hawkins*, 369 S.W.2d 305, 306–307 (Tex.1963); *Texas Employers Insurance Association v. Mallard*, 143 Tex. 77, 182 S.W.2d 1000, 1001 (1944); *Texas Employers Insurance Association v. Ray*, 68 S.W.2d 290, 291 (Tex.Civ.App.—Fort Worth 1934, writ ref'd). By its opinions in *Mallard* and *Hawkins*, the Supreme Court has clearly rejected any attempt to restrict or limit the definition of "total incapacity" to mean disability to perform the usual tasks in specific trades or occupations. Hence, in our review and analysis of the evidence in this case, we will apply the trial court's definition of "total incapacity."

■ Medical testimony conclusively establishes that Grimes, during the course of his employment with Nibco, was exposed to lead fumes emanating from the furnaces at Nibco's foundry, which resulted in toxic damages to the nerves in his body. In medical terms, he suffered from peripheral neuropathy, causing a loss of sensation in his hands, legs and feet. Also, because of the same illness, he had spells of dizziness, loss of balance when walking, memory loss and chronic leg cramps. Grimes himself testified that he had chronic leg cramps and muscular weakness, and he was unsteady on his feet. He stated that he could

---

**6.** Paradoxically with some equivocation because Grimes' job had since been eliminated by automation according to Hamilton.

**7.** *See Texas Employer's Ins. Assoc. v. Mallard,* 143 Tex. 77, 182 S.W.2d 1000, 1001 (1944).

**8.** We should not be understood as being opposed to a long overdue revision of the Workers' Compensation Act by the Texas legislature. The Act is plagued by archaic, ambiguous and unnecessary language and procedures, some of

which are destructive of the principal purpose of the Act to provide a worker with a simple and expeditious means of remuneration for loss of capacity to work in exchange for his surrender of many common law rights. Piecemeal amendments to the act having many instances failed to insure the balance sought to be achieved by the act.

**9.** From Drs. Roongta and Khatri.

not grip a tool in his hand and was unable to perform manual labor of any kind. Dr. Khatri stated that Grimes' affliction was more or less a permanent condition. We conclude that there is some evidence to support the findings made in Special Issues 3 and 5 that Grimes was totally and permanently incapacitated by the neuropathy. Point one is overruled.

After our review and reweighing of all the evidence before the jury, we cannot conclude that the findings of the jury in response to Special Issues 3 and 5 were so contrary to the evidence as to be manifestly wrong and unjust. Points two and three are likewise overruled.

The judgment is affirmed.